CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

Brick Institute of America, The Public Service Commission of the State of New York, Piedmont Natural Gas Company, Elizabethtown Gas Company, South New Jersey Gas Company, Atlanta Gas Light Company, Transcontinental Gas Pipe Line Corp., Public Service Company of North Carolina, Inc., North Carolina Natural Gas Corporation, Columbia Gas Transmission Corporation, Public Service Electric & Gas Company, United Cities Gas Company, Brooklyn Union Gas Company, New Jersey Board of Public Utility Commissioners, Brick Association of North Carolina, Washington Gas Light Company, South Carolina Public Service Commission and South Carolina Energy Management Office, General Motors Corporation, Staffer Chemical Company, Philadelphia Gas Works, Owens-Corning Fiberglas Corporation, American Textile Manufacturers Institute, Inc., and Long Island Lighting Company, Intervenors.

STATE OF NORTH CAROLINA and North Carolina Utilities Commission, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

Piedmont Natural Gas Company, Inc., Brick Institute of America, The Public

Service Commission of the State of New York, Public Service Company of North Carolina, Transcontinental Gas Pipe Line Corporation, North Carolina Natural Gas Corporation, Consolidated Edison Company of New York, United Cities Gas Company, Washington Gas Light Company, Pomana Corporation, Brick Association of North Carolina, South Carolina Public Service Commission and South Carolina Energy Management Office, General Motors Corporation, Staffer Chemical Company, Philadelphia Gas Works, Owens-Corning Fiberglas Corporation, American Textile Manufacturers Institute, Inc., and Long Island Lighting Company, (LILCO), Intervenors.

ALABAMA GAS CORPORATION, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

Southeast Alabama Gas District, Atlanta Gas Light Company, Southern Natural Gas Company, South Carolina Electric & Gas Company, Brick Institute of America, Georgia Industrial Group, and Alabama Public Service Commission, Intervenors.

BATTLE CREEK GAS COMPANY et al., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

National Distillers and Chemical Corporation, Michigan Gas Storage Company, Panhandle Eastern Pipe Line Company, General Motors Corporation, Caterpillar Tractor Company, Mueller Brass Company, Corning Glass Works, Missouri Refractories, Anderson Clayton Foods, Columbia Gas Transmission Corporation, Johns-Manville Fiber Glass, Inc., and City of Indianapolis, et al., Intervenors.

ATLANTA GAS LIGHT COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

South Carolina Electric & Gas Company,
Southern Natural Gas Company, Brick
Institute of America and Georgia In-
dustrial Group, Intervenors.

MICHIGAN CONSOLIDATED GAS
COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Michigan Gas Storage Company, Anchor
Hocking Corporation, Caterpillar
Tractor Company, National Distillers
& Chemical Corporation, Battle Creek
Gas Company, et al., Panhandle East-
ern Pipe Line Company, General Mo-
tors Corporation, Mueller Brass Com-
pany, Corning Glass Works, Inc., A. P.
Green Refractories Company, et al.,
Anderson Clayton Foods, etc., Colum-
bia Gas Transmission Corporation,
Johns-Manville Fiber Glass, Inc., and
City of Indianapolis, et al., Interve-
nors.

Nos. 73–1999, 73–2017, 74–1150, 74–1184,
74–1200 and 74–1231.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 21, 1974.

Decided May 19, 1975.

Petition for Clarification Granted and

Rehearing Denied July 25, 1975.

See 518 F.2d 448.

See also, 167 U.S.App.D.C. ——, 511
F.2d 372.

William I. Harkaway, Washington, D. C., with whom Charles J. McCarthy, Washington, D. C., and Robert A. Froehlich, New York City, were on the brief for petitioner in No. 73–1999.

Morton L. Simons, Washington, D. C., for petitioners in No. 73–2017.

Harold L. Talisman, Washington, D. C., with whom Melvin Richter, Washington, D. C., and A. S. Lacy, Birmingham, Ala., were on the brief for petitioner in No. 74–1150.

John E. Holtzinger, Jr., Washington, D. C., with whom Paul H. Keck, Washington, D. C., was on the brief for petitioner in No. 74–1150.

J. Richard Tiano, Washington, D. C., with whom Richard M. Merriman, Richard T. Witt, Washington, D. C., and Raymond P. Buschmann, Chicago, Ill., were on the brief for petitioners in No. 74–1184.

John E. Haley, Washington, D. C., with whom Richard J. Flynn, Frederic G. Berner, Jr., and Gary L. Cowan, Washington, D. C., were on the brief for petitioners in No. 74–1231.

George W. McHenry, Jr., Sol., Federal Power Commission, Washington, D. C., with whom Leo E. Forquer, Gen. Counsel, William J. Grealis, Thomas M. Walsh and John R. Staffier, Washington, D. C., were on the brief for respondent.

Richard A. Solomon, Washington, D. C., for intervenor National Distillers and Chemical Corp.

Raymond N. Shibley, Washington, D. C., with whom James J. Flood, Jr.,

Washington, D. C., was on the brief for intervenor Panhandle Eastern Pipe Line Co.

James J. Flood, Jr., Washington, D. C., with whom William A. Major, Jr., Birmingham, Ala., was on the brief for intervenor Southern Natural Gas Co.

Joseph P. Stevens, Brooklyn, N. Y., for intervenor Brooklyn Union Gas Co. No brief was filed by intervenor Brooklyn Union Gas Co. Barbara M. Gunther, Brooklyn, N. Y., entered an appearance for intervenor Brooklyn Union Gas Co.

John T. Ketcham and Robert J. Haggerty, Washington, D. C., were on the brief for petitioner Anchor Hocking Corp. in No. 74–1184.

Edward J. Grenier, Jr., Richard P. Noland, Richard J. Pierce, Jr., and David C. Evans, Washington, D. C., were on the brief for intervenors Brick Institute of America and Brick Ass'n of North Carolina.

Dale A. Wright and Melvin Richter, Washington, D. C., were on the brief for intervenor Piedmont Natural Gas Co., Inc.

John T. Miller, Jr., Washington, D. C., was on the brief for intervenor Elizabethtown Gas Co. and for intervenors A. P. Green Refractories Co., and others.

Frederick Moring, Washington, D. C., was on the brief for intervenor South Jersey Gas Co. Paul H. Keck, Washington, D. C., entered an appearance for intervenor South Jersey Gas Co.

Peter H. Schiff, Albany, N. Y., and Richard A. Solomon, Washington, D. C., were on the brief for intervenor Public Service Commission of the State of New York.

Daniel L. Bell, Jr., and Giles H. Snyder, Charleston, W. Va., were on the brief for intervenor Columbia Gas Transmission Corp.

George A. Avery, Toni K. Golden and James K. White, Washington, D. C., were on the brief for intervenor Michigan Gas Storage Co.

Henry F. Krautwurst, Monte R. Edwards and Susan A. Low, Washington, D. C., were on the brief for intervenor Washington Gas Light Co.

Edward S. Kirby, Newark, N. J., was on the brief for intervenor Public Service Electric and Gas Co. in support of petitioners motion for stay to maintain the status quo etc. James R. Lacey, Newark, N. J., entered an appearance for intervenor, Public Service Electric and Gas Co.

Thomas F. Ryan, Jr., Washington, D. C., entered an appearance for intervenor Transcontinental Gas Pipe Line Corp.

Donald W. McCoy and Alfred E. Cleveland, Fayetteville, N. C., entered appearances for intervenor North Carolina Natural Gas Co.

Jack M. Irion, Shelbyville, Tenn., entered an appearance for intervenor Union Cities Gas Co.

Joseph W. Ferraro, Jr., Pittsburgh, Pa., entered an appearance for intervenor The New Jersey Board of Public Utility Commission.

F. Kent Burns, Raleigh, N. C., entered an appearance for intervenor Public Service Co. of North Carolina, Inc.

William W. Ross, Washington, D. C., entered an appearance for intervenors Pomona Corp.

Edward J. Grenier, Jr., Richard P. Noland and Richard J. Pierce, Jr., Washington, D. C., entered appearances for intervenors General Motors Corp. and Georgia Industrial Group.

David C. Murchison and Richard S. Harrell, Washington, D. C., entered appearances for intervenor Caterpillar Tractor Co.

John W. Glendening Jr., and John S. Schmid, Washington, D. C., entered appearances for intervenor Mueller Brass Co.

Harold L. Talisman, Washington, D. C., entered an appearance for intervenor Corning Glass Works.

Michael J. Manning, Washington, D. C., entered an appearance for intervenor Anderson Clayton Foods.

Raymond D. Hurley, Washington, D. C., entered an appearance for intervenor Owens-Corning Fiberglas Corp.

James R. McClarnon, Indianapolis, Ind., entered an appearance for intervenor City of Indianapolis, etc.

George Mabry, Littleton, Colo., entered an appearance for intervenor Johns-Manville Fiber Glass Inc.

Ronald D. Eastman, Washington, D. C., entered an appearance for intervenor The American Textile Manufacturers Institute, Inc.

Ronald L. Winkler, Washington, D. C., entered an appearance for North Carolina Congressional Delegation to the Congress of the United States as amicus curiae and also for intervenor Brick Institute of America.

Peyton G. Bowman, III, Washington, D. C., entered an appearance for intervenor South Carolina Electric and Gas Co.

Carl L. Evans, Montgomery, Ala., entered an appearance for intervenor Alabama Public Service Commission.

William T. Miller, Washington, D. C., entered an appearance for intervenor Southeast Alabama Gas District.

M. John Bowen, Jr., Columbia, S. C., entered appearances for intervenors South Carolina Public Service Commission and South Carolina Energy Management Office.

Jerome Ackerman, Washington, D. C., entered an appearance for intervenor Staffer Chemical Co.

Edward W. Stern, Philadelphia, Pa., entered an appearance for intervenor Philadelphia Gas Works.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge, and AUBREY ROBINSON, Jr.,* United States District Judge for the District Court of the District of Columbia.

BAZELON, Chief Judge:

Petitioners in these cases are customers of natural gas pipelines subject to the jurisdiction of the FPC. The three pipelines involved, Transcontinental Gas Pipe Line Corporation (Transco),[1] Southern Natural Gas Company (Southern),[2] and Panhandle Eastern Pipe Line Company (Panhandle),[3] are experiencing systemwide shortages and have been forced to cut back deliveries during the past several winters, the peak demand season. As might be expected, these shortages have generated sharp disputes over the allocation of supplies among competing customers. Finding themselves caught in the middle, the pipelines have experimented with various allocational schemes, and their efforts have been guided, with increasing firmness, by the FPC itself. The current litigation arose from the FPC's recent initiatives in implementing Order No. 467,[4] governing the "utilization and conservation of natural gas resources."

The background of Order No. 467 is set out in our opinion in Pacific Gas and Electric Co. v. FPC.[5] In essence the order stated that it was the Commission's policy to require curtailments on the basis of the uses made of the gas (end use) rather than on the basis of prior contractual commitments (pro rata), and it set forth nine priority of service categories based on end use. The terms of the order required "full curtailment of the lower priority category volumes to be accomplished before curtailment of any higher priority volumes is commenced."[6]

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. No. 73–1999, Consolidated Edison Co. v. FPC; No. 73–2017, North Carolina v. FPC.

2. No. 74–1150, Alabama Gas Corp. v. FPC; No. 74–1200, Atlanta Gas Light Co. v. FPC.

3. No. 74–1184, Battle Creek Gas Co. v. FPC; No. 74–1231, Michigan Consolidated Gas Co. v. FPC.

4. Statement of Policy, Utilization and Conservation of Natural Resources—Natural Gas Act,

Order No. 467, Docket No. R–469, 49 F.P.C. 85 (1973). Order No. 467 was subsequently clarified and amended in Order No. 467–A, 49 F.P.C. 217 (1973), and in Order No. 467–B, 49 F.P.C. 583 (1973). These orders will be referred to collectively as Order No. 467, or simply 467, unless otherwise necessary for clarity.

5. 165 U.S.App.D.C. ——, 506 F.2d 33 (1974).

6. 49 F.P.C. at 87.

Highest priority was given to residential and small commercial customers; large commercial users and various categories of industrial users completed the list.[7] As the order purported to be a general policy statement rather than a rule of binding effect, the Commission declined to order pipelines to file conforming tariffs. At the same time, it stated that tariffs not in accord with its priorities would be subject to suspension and that "any curtailments made under nonconforming tariff sheets which have not received Commission approval may be found to be unjust and unreasonable . . . ."[8]

Order No. 467 was issued January 8, 1973. At the time Panhandle was curtailing under an interim plan which it had negotiated among its customers, pending the outcome of hearings on a proposed permanent plan which the pipeline had filed with the FPC in 1971. The interim settlement plan expired by its own terms on October 31, 1973. On October 1, Panhandle filed an interim plan patterned after Order No. 467. It requested the Commission to allow this plan to go into effect on November 1, 1973, in time for the 1973–74 heating season, if the Commission refused to extend "the present curtailment procedures."[9] In its order of November 6, 1973, the Commission denied Panhandle's motion for an extension of the existing interim plan, and accepted and made effective its new 467 filing.[10] On December 28, 1973, it denied rehearing.[11]

Transco too was operating under an interim settlement plan during the winter of 1972–73. This arrangement expired by its own terms on November 15, 1973, and required Transco to file a permanent plan with the Commission no later than May 1, 1973. In May 1973 the FPC denied a motion by the pipeline to extend the interim plan for another year.[12] Transco responded by filing a 467-type permanent plan but at the same time renewed its motion to extend the interim agreement pending final decision on the permanent proposal.[13] The Commission again denied the motion, suspended the 467 plan until November 16, 1973, and scheduled hearings.[14]

■ Southern found itself in a somewhat different posture when Order No. 467 was handed down. It was then curtailing under a permanent plan which it had filed in 1971 and on which hearings before the FPC had already been held although no decision had been reached. The FPC's staff moved to reopen the hearing record and to require Southern to file a 467 plan. The Commission ordered the record reopened but denied the second half of the staff's request with the recitation that Order No. 467 was a guide rather than a rule.[15] Southern proposed a 14-step end use plan, which the Commission rejected by letter order

---

**7.** The priorities of service distinguished between users operating under "interruptible" contracts and those with "firm" requirements. The validity of this distinction, in the particular circumstances of the Transco case, was brought into question in our per curiam of November 26, 1974, in these cases. Consolidated Edison Co. v. FPC, No. 73–1999, 167 U.S.App.D.C. ——, —— ——, 511 F.2d 372 at 379–380. Further gradations among consumers were based on daily volumes of use.

**8.** 49 F.P.C. at 585.

**9.** Jt.App. 275 (Nos. 74–1184, 74–1231).

**10.** Order Accepting and Making Effective Tendered Curtailment Plan, Denying Motion for Extension of Interim Curtailment Plan, and Granting Interventions, Docket No. RP 71–119, Jt.App. 371 (Nos. 74–1184, 74–1231).

**11.** Order Denying Applications for Rehearing, Docket No. RP 71–119, Jt.App. 424 (Nos. 74–1184, 74–1231).

**12.** Order Denying Motion for One-Year Extension of Interim Curtailment Plan and Providing for Filing of Curtailment Plan, Docket No. RP 72–99, Jt.App. 42 (Nos. 73–1999, 73–2017).

**13.** Jt.App. 51 (Nos. 73–1999, 73–2017).

**14.** Order Denying Motion for Reconsideration, Permitting Intervention, Fixing Date of Hearing, Specifying Procedures, and Suspending Proposed Revised Tariff Sheets, Jt.App. 55 (Nos. 73–1999, 73–2017).

**15.** Order Reopening Record to Receive Additional Evidence and Denying Motion to Omit Intermediate Decision, Docket No. RP 72–74, Jt.App. 25 (Nos. 74–1150, 74–1200).

on April 27, 1973.[16] The pipeline then submitted a 9-step plan, which the Commission suspended for two months and set for hearing.[17] On December 28, the Commission denied rehearing.[18] Petitioners in all three of these cases contest orders of the Commission providing for the effectuation of the 467-type plans filed by the pipelines and rejecting alternative proposals.

After filing their appeals, petitioners in each case moved for a stay *pendente lite*. In two cases, those involving Transco and Southern, stays were granted.[19] In a per curiam issued November 26, 1974,[20] we reviewed the interim situation, and found that "the existing arrangement—with a stay in effect in the Southern case [implementing its 1971 filing] and the stay denied in Panhandle [leaving its 467 filing in effect]—was likely to be as protective of customers during the coming winter as any alternative." [21] At the same time we found that the interim settlement plan in effect on the Transco system by virtue of our prior stay was no longer adequate and responded by implementing a new interim settlement agreement which had just recently been proposed to the Commission by the pipeline and its customers.[22]

The central importance which relief pending decision has assumed in these cases is indicative of the nature of the underlying litigation. The petitioners do not contest the authority of the FPC to impose a 467-type plan on the pipelines after evidentiary hearings and decision on the record. But they do contest the Commission's power to take the steps which it has taken in shaping the curtailment practices of pipelines during the interim. Hearings before the Commission have since been completed in each of these cases, with final decisions possible in time for the 1975–76 heating season.[23] Thus, this phase of the allocational controversy may be nearly over, the stakes having been determined, as a practical matter, by our disposition of these cases *pendente lite*. But as we have no way of knowing when in fact the Commission will make its final determinations, we think it best to proceed to the merits in order to resolve the uncertainties under which the Commission and the parties are now laboring.

**16.** Brief for Respondent FPC, Apps. C–D (Nos. 74–1150, 74–1200). Technically the Commission does not have authority under the Natural Gas Act to "reject" a proposed filing, although it may suspend a filing for a period of months, or after hearing, replace a filing with a tariff deemed just and reasonable by it. *See* text accompanying notes 24–26 *infra*. In this case, however, Southern had requested the Commission to "reject this filing" if not in compliance with Order No. 467 and to "advise Southern how this filing should be modified so as to be in full compliance with such orders."

**17.** Order Accepting for Filing Tendered Tariff Sheets, Suspending Tariff Sheets, Granting Interventions, Denying Motion to Reject, Consolidating Dockets, Providing for Hearing and Establishing Procedures, Jt.App. 70 (Nos. 74–1150, 74–1200).

**18.** Order Denying Petitions for Rehearing and Request for Stay and Granting Untimely Intervention, Jt.App. 108 (Nos. 74–1150, 74–1200).

**19.** *See* Consolidated Edison v. FPC, *supra* note 7, 167 U.S.App.D.C. at —— & n. 4, 511 F.2d at 377.

**20.** Consolidated Edison v. FPC, *supra* note 7.

**21.** *Id.* at 10.

**22.** The terms of our stay were subject to modification by the Commission on certification to this court and after the court's approval thereof. On January 10, 1975, the Commission reviewed the new interim settlement arrangement on rehearing, finding it unlawful due to a compensation scheme embodied in it, but did not purport to disturb the operation of that plan pursuant to our orders. Order Granting Rehearing in Part, Denying Rehearing in Part, and Requiring Environmental Impact Statement, Docket No. RP 72–99, *reprinted in* Motion of North Carolina Petitioners to Modify Stay and Request for Expedited Consideration, App. V (Nos. 73–1999, 73–2017) [hereinafter cited as Order of Jan. 10, 1975].

**23.** *Id.* at 15. A recent submission by petitioners in a separate but related appeal, Motion for Expedited Briefing Schedule and Oral Argument, Transcontinental Gas Pipe Line Corp. v. FPC, No. 74–2036 (D.C.Cir.), stated that "[i]t is highly unlikely that the Commission will be able to prescribe a permanent plan in time for next winter."

I.

Section 4 of the Natural Gas Act[24] requires pipelines and other regulated concerns to file new schedules for rates, charges, classifications or service with the Commission 30 days prior to their effective date. The Commission has discretion under § 4(e)[25] to suspend a filing for up to five months beyond the time when it would otherwise go into effect, pending hearings and a decision on its lawfulness. If the Commission finds at the conclusion of hearings that a schedule is unlawful, section 5(a) authorizes imposition of an alternative deemed reasonable and fair by the Commission.[26]

In FPC v. Louisiana Power and Light Co.,[27] the Supreme Court had occasion to interpret the FPC's authority to regulate curtailment practices within the framework of the Natural Gas Act. A central issue in that case was the lawfulness of 467's precursor, Order No. 431,[28] which required pipelines facing shortages to develop and submit rational curtailment plans under section 4 of the Act. The Court found, as a threshold matter, that the Commission had authority to regulate the curtailment practices of pipelines under its "transportation" jurisdiction[29] and section 16 of the Act,[30] empowering the agency to take steps "necessary or appropriate to carry out the provisions of this chapter . . . ." The antidiscriminatory provisions of section 4(b) provided the substantive standard governing curtailment practices, and sections 4 and 5 offered two procedural mechanisms for enforcing that standard. The section 4 procedure had the obvious advantage of avoiding the delay attendant upon hearings, allowing curtailment plans to be effective from the time of filing, or at least within thirty days thereafter, rather than from the time of decision. In light of what it saw as the Commission's broad powers to "devise effective means to meet [its] responsibilities,"[31] the Court upheld Order No. 431's reliance on company-initiated filings under section 4. Louisiana Power and Light Co. notwithstanding, petitioners in these cases contend that the FPC went beyond its authority in seeking to implement the end-use priorities of Order No. 467 under section 4 rather than section 5. The basis for their claim is provided by Moss v. CAB.[32]

Moss involved a statutory scheme very similar to the one we have examined here. Under the Federal Aviation Act, fares can be set by the carrier or by the CAB.[33] Fares filed with the Board by the carriers may be allowed to go into effect or may be suspended up to seven months and investigated. The Board may order a change in an existing rate but only after notice and hearing.

In the Moss case, the Board had concluded, after repeated ex parte meetings with the carriers, that an increase in fares was warranted.[34] It suspended all tariff increases which had recently been filed by the carriers and at the same time issued a detailed formula for computing fares and announced that it would consider fares consistent with the formula to be just and reasonable, and that any "fare in excess of this ceiling would be viewed prima facie as outside the realm of justness and reasonableness and would ordinarily be suspended and ordered investigated."[35] Impelled by the need for immediate relief from the

---

24. 15 U.S.C. § 717c (1970).

25. The Commission's power to suspend may be exercised either on complaint of a local jurisdiction or a gas distributing company, or on its own motion.

26. 15 U.S.C. § 717d (1970).

27. 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

28. 45 F.P.C. 570 (1971).

29. 15 U.S.C. § 717(b) (1970).

30. Id. § 717o.

31. 406 U.S. at 642, 92 S.Ct. at 1839.

32. 139 U.S.App.D.C. 150, 430 F.2d 891 (1970).

33. 49 U.S.C. §§ 1373, 1482 (1970).

34. 430 F.2d at 894.

35. Id. at 897.

rate ceilings then effective, the airlines withdrew their previous filings and submitted new proposals based on the Board's formula. We found that "as a practical matter the Board's order amounted to the prescription of rates . . .," and that the rates prescribed were invalid because they had not been preceded by notice or hearing.[36] In deciding whether a similar result is warranted in these cases, we must explore the nature of the pressures behind Order No. 467 and the range of alternatives which, as a practical matter, remained open to the pipelines.

In clarifying the operation of 467, the FPC acknowledged that the pipelines were "still free to file tariff changes under Section 4 in whatever form they choose."[37] But this was accompanied, as we have seen, by a warning that filings not in accord with the terms of 467 would be suspended and investigated and subject to final disapproval as "preferential or discriminatory . . ."[38] The Commission also voiced its general intention not to suspend conforming tariff sheets. This general warning was echoed in the FPC's order of May 23, 1973, denying Transco's motion for an extension of its interim plan: "Transco," the Commission stated, "undoubtedly recognizes the risks attendant to curtailing under any plan which does not conform to Order 467–B."[39] A similar admonition was directed at Southern in the FPC's order of March 7, 1973,[40] and another reminder followed on December 28, 1973, with the Commission's observation that Southern had not yet moved to effectuate its 467 filing.[41] Panhandle does not appear to have received a direct warning, but petitioners in that case refer to the language of 467 itself and the conformity which the Commission is alleged to have required in other proceedings.

The source of the agency's leverage is less obvious in these cases than in *Moss.* The pipelines appear to have little direct stake in whether they curtail under a 467 plan or any other plan. As we noted in *Pacific Gas and Electric Co.,*[42] "the pipelines sell all the gas they can during periods of shortage and consequently are not overly concerned with which customers receive it." What does concern the pipelines is the possibility that they will be held civilly liable for failure to supply contract requirements to their customers. Although the exact nature and extent of this liability has yet to be resolved,[43] the pipelines may reasonably estimate their risks to be less if they curtail under a plan which is likely to be upheld by the FPC rather than a plan which is likely to be rejected as unlawful and replaced with another. This model explains both the pipelines' desire in these cases to curtail if possible under an interim plan agreed to by all or most of their customers,[44] and their urge in the alternative to

---

36. *Id.*

37. 49 F.P.C. at 585.

38. *Id.*

39. Jt.App. 43 (Nos. 73–1999, 73–2017).

40. Jt.App. 27 (Nos. 74–1150, 74–1200).

41. *Id.* 109.

42. *Supra* note 5, 506 F.2d at 36.

43. State of Louisiana v. FPC, 503 F.2d 844 at 872 (5th Cir. 1974); *see* International Paper Co. v. FPC, 476 F.2d 121 (5th Cir. 1973); Monsanto Co. v. FPC, 149 U.S.App.D.C. 396, 463 F.2d 799, 803 (1972). The Commission's most recent position on this issue, which was questioned in State of Louisiana v. FPC, *supra,* came in Opinion and Order on Rehearing Clarifying and Modifying Opinion No. 647 and Or-

der, Opinion No. 647–A, Docket Nos. RP71–92, RP71–120, 49 F.P.C. 1211, 1220:

> With regard to the question of general damage liability for breach of contract based upon curtailment of gas deliveries, we agree with the reasoning of the concurring opinion in *International Paper* that two categories of litigation are presented: (1) litigation in which a customer is unable to show that his service was reduced by anything other than a governmentally ordered curtailment plan which was necessary as a result of the gas shortage, and (2) litigation in which it can be shown that the pipeline's need to curtail resulted from its own negligence, bad faith, or other wrongful conduct. With regard to the first situation, we think that pipeline must be completely exonerated as a matter of law. . . . With regard to the second category of cases, we have neither the power nor de-

acquiesce in the 467 paradigm, which bore a bold stamp of official approval.[45]

Clearly the pressure was on. But our task remains to assess, by what crude means we have at our disposal, the actual impact of that pressure on the pipelines' ability to choose among alternatives.[46] In *Moss* it appeared that all of the carriers filed fare increases which complied with the Board's formula. In these cases, supplemental submissions from the FPC indicate that several major pipelines currently have non-467 plans in effect.[47] Among these is Panhandle's wholly owned subsidiary, Trunkline Gas Company, which continues to curtail on a wholly *pro rata* basis.[48] Transco's filing, although substantially in compliance with 467, included a significant modification of the priority scheme by providing that all direct interruptible customers be completely curtailed prior to curtailment of indirect interruptible customers: Order No. 467 put all interruptible customers on the same footing.[49] Transco also deviated from 467, in the Commission's analysis, in its incorporation of a compensation scheme, under which customers favored by the plan

would make payments to customers suffering as a result.[50]

It is also significant, in attempting to assess the practical scope of the discretion retained by the pipelines, that Order No. 467 did not cover all aspects of curtailment policy.[51] Significant elements of both the Transco and Southern filings were, as the Commission observed, outside the purview of 467. These included a ceiling on demands of priority customers based on contract requirements (Southern)[52] and the definition of central terms, such as "gas supply deficiency" (Transco).[53]

■ This evidence of a degree of independence and flexibility on the part of the pipelines leads us to view the problem in broader perspective. Regulation through "raised eyebrow" techniques seems inherent in the structure of most administrative agencies, combining as they do both policy-making and adjudicative functions. Short of sweeping condemnation of "the system," judicial attempts to control it must be sensitive to the particular regulatory context in which it occurs, the interests affected by it,[54] and the potential for abuse.

---

sire to adjudicate United's contract liability, for as recognized in *International Paper*, that is within the province of the appropriate court. (footnotes omitted).

**44.** Both Transco and Panhandle proposed extensions of interim plans then in effect as alternatives to the immediate implementation of 467 filings, which did not have the assent of the pipelines' customers. *See* Jt.App. 52–53 (Nos. 73–1999, 73–2017); Jt.App. 221 (Nos. 74–1184, 74–1231).

**45.** It also explains why in at least two of these cases, Panhandle and Southern, in the course of filing their 467 plans, the pipelines continued to assert the justness and reasonableness of the plans under which they had been operating. *See* Jt.App. 274–75 (Nos. 74–1184, 74–1231); Jt.App. 30 (74–1150, 74–1200).

**46.** *See* National Ass'n of Motor Bus Carriers v. FCC, 460 F.2d 561, 567 (2d Cir. 1972):

In *Moss*, therefore, the airlines' "discretion" was so circumscribed as to have been almost nonexistent. The situation was not such that the airlines in fact had an option to choose between alternatives.

**47.** These submissions were made to the court on November 26 and 29, 1974. They show the

following pipelines, among others, curtailing on non-467 schedules: Cities Service Gas Co., Colorado Interstate Gas Co., Columbia Gas Transmission Co., Lone Star Gas Co., Northwest Pipeline Corp., United Gas Pipe Line Co. Some of these plans appear to be straight pro rata; others are modified end use plans.

**48.** According to the Commission's submissions, Trunkline submitted no plan subsequent to Order No. 467 and continues to curtail under the pro rata plan which it filed as its initial response to Order No. 431. *See* Brief for Intervenor National Distillers and Chemical Corp. at 20 (Nos. 74–1224, 74–1231).

**49.** Jt.App. 56 (Nos. 73–1999, 73–2017).

**50.** *Id.*

**51.** *See* SCRAP v. United States, 412 U.S. 669, 693 n. 17, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1972); National Ass'n of Motor Bus Owners v. FCC, *supra* note 46.

**52.** Jt.App. 70 (Nos. 74–1150, 74–1200).

**53.** Jt.App. 56 (Nos. 73–1999, 73–2017).

**54.** Courts may be more likely, for example, to restrict regulation by informal means where first amendment values are at stake rather than purely economic interests. *See* Bantam

These cases do not involve the Commission's quotidian responsibilities in setting rates and issuing certificates for new facilities. Rather they deal with its influence over the allocation of a major energy resource in a period of serious national shortage. The shortage itself appears to have come with a suddenness and severity which the agency failed to anticipate. With it, came the recognition that in the absence of some guidance from the Commission, the allocation of scarce supplies might be too much governed by concentrated economic interests rather than the public interest generally. In *American Smelting*, we pointed out that "the existence of an emergency . . . does not create special powers in the Commission, . . nor does it abrogate the usual procedural requirements for valid administrative action." [55] At the same time, *Louisiana Power and Light Co.* teaches that a shortage of current proportions should be considered in defining the FPC's discretion to choose among available procedures.

And in these cases, we do not find abuses of the sort we faced in *Moss*. There the court observed that the agency's dealing appeared to favor regulated concerns at the expense of consumers. Against this background, we stressed that the CAB's rate formula was the product of behind-the-scenes bartering between the agency and the carriers, and

that none of the tariffs filed consistent with the CAB's formula were subject to investigation after they became effective. By contrast, the issues in these cases cannot be put comfortably in terms of "whether the regulatory agency is unduly oriented toward the interests of the industry it is designed to regulate." [56] Our analysis suggests that the FPC's selection of one set of priorities rather than another was of no vital concern to the pipelines.[57] Petitioners do not suggest that Order No. 467 grew out of *ex parte* contacts with the pipelines, or any other interest group. The Commission policy appears, in fact, to have evolved from individual curtailment proceedings, and although 467's adoption was not preceded by notice and comment, the agency responded publicly to numerous petitions for rehearing, reconsideration, modification and clarification.[58] Further, consistent with the Commission's statement that 467 "expressly envisions further proceedings," [59] extensive hearings in each of these cases have been held. The effect of the Commission's choice of procedures was thus to favor rapid implementation over prior hearing, not to avoid public scrutiny entirely. Under the circumstances, we cannot say that the Commission's timing contravened the Natural Gas Act, and consequently we think the *Moss* claim must fail.[60]

We admit to a certain uneasiness at this juncture, however. As the Su-

---

Books, Inc. v. Sullivan, 372 U.S. 58, 66–70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201, 1214 (1971). The validity of this principle is not undercut by the fact that in my view it should be applied more expansively than other members of the court have seen fit. *See, e. g.,* Illinois Citizens Comm. for Broadcasting v. FCC, No. 73–1652 (D.C.Cir. March 13, 1975) (Statement of Bazelon, C. J., as to why he voted to grant rehearing *en banc*); Yale Broadcasting Co. v. FCC, 155 U.S. App.D.C. 390, 478 F.2d 594, 603 (1973) (Statement of Bazelon, C. J., as to why he would grant rehearing *en banc, sua sponte*).

**55.** 161 U.S.App.D.C. 6, 494 F.2d 925 at 933.

**56.** Moss v. CAB, *supra* note 32, 430 F.2d at 893. It was with this phrase that *Moss* framed the issue before the court for decision.

**57.** *See* text accompanying notes 42–45 *supra*.

**58.** Order No. 467–B, *supra* note 4.

**59.** 49 F.P.C. at 585.

**60.** A helpful analogy is provided by cases dealing with whether administrative action is sufficiently final for judicial review. Like the instant case, these cases confront what is essentially a question of timing, balancing present injury to petitioners against the interests of both the agencies and the courts in having administrative processes run their full course prior to review. *Compare* Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App. D.C. 74, 439 F.2d 584 (1971); Isbrandtsen v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51 (1951), *with* United Gas Pipe Line Co. v. FPC, 86 U.S.App.D.C. 314, 181 F.2d 796 (1950).

preme Court has recognized, the Commission's utilization of section 4 procedures in the context of curtailment depends heavily on "each pipeline's unique knowledge of its customers' needs, ability to substitute other fuel sources, and other relevant considerations." [61] But where, as in these cases, the pipelines' filings are shaped significantly by the Commission's expectations, that "unique knowledge" may play a diminished role. Our recognition of this is coupled with an awareness that the effects of curtailment, even over the short term, can be irrevocable. To customers which have access to alternative sources of supply or can utilize another fuel, curtailment may mean only higher fuel costs. [62] To others, it may mean operating at reduced capacity, or shutting down entirely, with attendant economic dislocations. The Commission has indicated that curtailment schedules should provide for "supplemental deliveries where required to forestall irreparable injury to life or property." [63] But quite apart from its efforts to guarantee emergency relief in appropriate cases, the Commission has a responsibility to monitor whatever interim plan may be in effect pending a final decision, and to make such adjustments as may appear warranted. In our per curiam opinion of November 26, 1974, we recognized powers commensurate with this responsibility when we stated that the FPC might issue interim curtailment orders based on evidence compiled in hearings on a permanent plan. [64] Our de-

cision today places heavy reliance on the Commission's conscientious discharge of its oversight function.

## II.

As an alternative to an immediate implementation of a 467-type plan, both Panhandle and Transco moved the Commission for an extension of the negotiated interim plans then in effect, pending the selection of a permanent plan after hearings. Petitioners in those cases contend that the FPC's denial of the motions to extend violated Michigan Consolidated Gas Company v. FPC. [65] In that case the Commission had before it a settlement proposal which offered a plausible resolution of the issues in an abandonment proceeding. The agency refused to consider the proposal, "whatever its merits," [66] because it did not have the assent of one of the parties. We held that the Commission erred in dismissing the proposal out of hand.

There is little question that the plans which Panhandle and Transco sought to have extended were settlement proposals within the broad terms of *Michigan Consolidated*. Both had the support of most, if not all, of the parties, and both offered an interim solution which had been operationally tested. Whether these proposals received the kind of consideration to which they were entitled under the circumstances presents an interesting question. [67] We see no need to resolve it,

---

**61.** FPC v. Louisiana Power and Light Co., *supra*, note 27, 406 U.S. at 645, 92 S.Ct. at 1841.

**62.** And some of these costs may be recoverable from the pipeline in a civil action. *See* cases cited note 43 *supra*.

**63.** 49 F.P.C. at 219.

**64.** Consolidated Edison Co. v. FPC, *supra* note 7, 167 U.S.App.D.C. at —— ——, 511 F.2d at 381–382; *see* FPC v. Louisiana Power and Light Co., *supra* note 27, 406 U.S. at 644 n. 18, 92 S.Ct. 1827, *citing* FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942).

**65.** 108 U.S.App.D.C. 409, 283 F.2d 204, cert. denied sub nom., Panhandle Eastern Pipe Line Co. v. Michigan Consol. Gas Co., 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960).

**66.** *Id.* 283 F.2d at 224.

**67.** In addition to its attacks on the status of the interim plan as a "settlement" in the Panhandle case, the Commission based its rejection on the failure of the plan to "afford consideration of factors relating to end use . . . ." or to "permit allocation to be based on end use." Battle Creek Gas Company asserts that the plan did take end use into account, and Panhandle itself, while opposing Battle Creek in the present appeal, has characterized the interim arrangement as an end-use plan, curtailing "among all customers—industrial and utility alike—on the basis of their industrial usage of gas." Brief of Intervenor Panhandle Eastern Pipe Line Co. at 11 (Nos. 74–1184, 74–1231).

however, because in neither case does the alternative rejected by the Commission appear to remain a viable one. Panhandle's 467 filing has been in effect since November 1973, undisturbed by order of this court. At oral argument Panhandle's attorney stated that the 467 plan was operating satisfactorily and that the interim plan would not be adequate under current circumstances. This was not disputed by counsel for the other parties. Similarly, the interim plan which Transco sought to have extended no longer appears adequate to deal with shortages on the system.[68] Transco and its customers recently proposed a revised interim settlement plan to take its place. The Commission's rejection of that plan is the subject of a separate appeal.[69]

## III.

Petitioners in the Panhandle and Transco cases also attack the FPC's determination to allow the pipelines' 467 to go into effect in time for the 1973–74 heating season, as the interim regimen. That determination was arbitrary, petitioners contend, because the data availa-

ble for implementation of those plans was inadequate and untested, and there was no preliminary finding that the 467 schedules were nondiscriminatory. We may take this as a more modest formulation of the arguments with which we dealt in Part I: even though the agency may not have been required to hold fullblown hearings in these cases under section 5, it was obligated to make a threshold investigation of possible weaknesses and inequities in the 467 filings prior to their being effectuated by the pipelines. As the Fifth Circuit noted recently in dealing with the same issue, section 4 of the Natural Gas Act does provide that a decision to suspend a company's filing must be accompanied by "a statement in writing of its reasons for such suspension."[70] But apart from this, there is no requirement that the Commission undertake a preliminary review. And we hesitate to infer such a requirement in the face of *Louisiana Power and Light Co.'s* implication that the Commission should be granted maximum latitude under section 4 "to act 'now' and find facts later."[71] This result is sub-

---

The FPC's rejection of the interim plan in the Transco case appears to rest on even shakier ground. Initially the Commission denied the pipeline's motion to extend simply because the interim plan did not satisfy Transco's commitment to file a proposed permanent plan by May 1, 1973. On reconsideration, it rejected the interim arrangement because it did "not conform to the standards for priorities of deliveries as enunciated by Order Nos. 467, 467–A, and 467–B." Jt.App. 56 (Nos. '73–1999, 73–2017). This adherence to the priorities of 467 suggests that, in this instance at least, the Commission did indeed stand on the order as a binding rule, with the result that Transco's proposal did not receive consideration on the merits.

**68.** Consolidated Edison Co. v. FPC, *supra* note 7, 167 U.S.App.D.C. at —— ——, 511 F.2d at 378–379.

**69.** No. 74–2036, Transcontinental Gas Pipe Line Corp. v. FPC.

**70.** 15 U.S.C. § 717c(e) (1970).

**71.** Atlanta Gas Light Co. v. FPC, 476 F.2d 142, 148 (5th Cir. 1973).

Petitioners in the Panhandle case raise a related claim that the Commission's action providing for the effectuation of the 467 plan did not afford due process in failing to provide

opponents of the plan "an opportunity to test the data by cross-examination." Brief of Michigan Consolidated Gas Co. at 25 (Nos. 74–1184, 74–1231). In light of the foregoing analysis, this amounts to an assertion that the section 4 procedure, as employed in these cases, is unconstitutional. We may grant that due process considerations are applicable to Commission actions under section 4, particularly where, as in these cases, the agency has involved itself to some degree in the shaping of the tariffs submitted, and where irrevocable effects may flow from their implementation on an interim basis. But the question remains what process is due. Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The existence of exigent circumstances, such as were involved here with the onslaught of the 1973–74 winter, is a recognized factor in making this determination. *See, e. g.,* Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Bowles v. Willingham, 321 U.S. 503, 520–21, 64 S.Ct. 641, 650, 88 L.Ed. 892 (1944) (upholding Emergency Price Control Act's failure to provide for hearing prior to issuance of rent reduction orders on grounds that "Congress was dealing here with the exigencies of wartime conditions and the insistent demands of inflation control."). In each of these cases, the Commission received submissions from the in-

ject, of course, to the same reservations expressed at the conclusion of Part I.[72]

## IV.

Petitioner Battle Creek Gas Co. advances the contention that the FPC erred in treating Order No. 467 as a substantive rule. In *Pacific Gas and Electric Co.*, we faced a challenge to the lawfulness of 467 based on the Commission's failure to comply with the notice and comment requirements established by the Administrative Procedure Act. We found that 467 was exempt from these requirements because the Commission's order, by its own terms, had "no final, inflexible impact upon the petitioners." [73] At the same time we stated that

since the statement will be applied prospectively, the courts are in a position to police the Commission's application of the policy and to insure that the Commission gives no greater effect to Order No. 467 than the order is entitled to as a general statement of policy.[74]

We think petitioner's claim, as it may relate to the FPC's rejection of interim alternatives, is precluded by our discussion in Part II. As it may relate to the agency's pressuring pipelines to file 467-type plans, it appears to be a restatement of the *Moss* argument dealt with in Part I, and we reject it for the same reasons. But this does not end the policing function of the courts contemplated by *Pacific Gas and Electric Co.* Final orders of the Commission implementing

permanent curtailment plans will be subject to review, at which the agency "must be prepared to support the policy [of 467] just as if the policy statement had never been issued." [75]

## V.

■ "End use," as defined by the Commission, is the use made of gas by the ultimate consumer. The ultimate consumer may purchase directly from the pipeline or indirectly from a customer of the pipeline. Order No. 467 states that direct and indirect customers will be placed in the same priority-of-service position when their use of gas is comparable. Battle Creek Gas Co. makes the novel claim that this arrangement is impermissible because "the Commission has no jurisdiction to prevent discrimination between direct and indirect customers using natural gas supplied by Panhandle." [76] We may grant the premise of this argument without accepting its conclusion. The Commission itself acknowledged in 467 that some sales to ultimate customers were beyond its jurisdiction.[77] 467 does not purport to govern those sales, although it does call on state authorities to aid in its implementation. Viewed against this background, Battle Creek's assertion appears to be that the limitations on the jurisdiction of the FPC preclude the agency from even taking into account the end uses of indirect customers. We think this position conflicts both with our observation in *American Smelting* that "end use is a most appropriate consideration for purposes of

---

tervenors, many in the form of petitions for rehearing, and gave a written explanation for its actions. Without indicating any opinion on the substantive merits of the 467 plans submitted, we think deferral of full adversary proceedings was permissible under the circumstances. *See also* Arnett v. Kennedy, 416 U.S. 134, 164, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring) (The concurrence opted for a balancing test in determining whether due process required an evidentiary hearing *prior* to the removal of a government employee: "the Government's interest in expeditious removal . . . is weighed against the interest of the affected employee in continued public employment." *Id.* at 168, 94 S.Ct. at 1651); Union of Concerned Scientists v. AEC, 163 U.S.App.D.C. 64, 499 F.2d 1069, 1081

(1974) ("Administrative action taken prior to a full hearing has always been permissible when the state's interest in acting promptly to promote the general welfare . . . outweighs the individual's interest in having an opportunity to be heard.").

72. Text accompanying notes 61–64 *supra.*

73. 506 F.2d at 41.

74. *Id.*

75. *Id.* at 38.

76. Brief of Battle Creek Gas Co. at 17 (Nos. 74–1184, 74-1231).

77. 49 F.P.C. at 87.

a curtailment plan," [78] and more broadly with the Supreme Court's directive that the FPC must possess "broad powers to devise effective means to meet [its] responsibilities." [79]

## VI.

Petitioners in the Transco and Panhandle cases raise a claim under section 102(2)(C) of NEPA, which requires that an environmental impact statement accompany agency proposals for "major Federal actions affecting the quality of the human environment." [80] The FPC filed no impact statement preparatory to issuing the orders under appeal in these cases. The Government does not dispute that these were "major" actions, or that they had significant environmental consequences. Its defense is based solely on our finding in *American Smelting* that

the Commission's duty under the Natural Gas Act to prevent discriminatory practices in times of natural gas shortage called for prompt action. This created the type of 'statutory conflict' which alone can excuse compliance with section [102(2)(C)].[81]

■ Petitioners seek to distinguish *American Smelting* on the grounds that the pipeline in that case had no plan in operation prior to the one imposed by the Commission. In these cases, they argue, interim plans which had proved workable were in effect; thus, exigent circumstances did not exist to justify non-compliance with the statute. But all this ignores the fact that the plans in effect on the Transco and Panhandle systems expired by their own terms prior to the winter of 1973–74. The Commission was required to act, and to act promptly: there is no suggestion here, as there was in *American Smelting*,[82] that shortages necessitating curtailment did not in fact exist, or that either pipeline might have managed through even part of a winter without some curtailment scheme.

■ We do not go so far as the Fifth Circuit appears to have gone in declaring recently that "it is well-settled that the FPC is not required to file impact statements for interim curtailment plans." [83] In *American Smelting*, as a condition of upholding the FPC's refusal to file an impact statement on an interim plan, we required "express findings which demonstrate the 'statutory conflict' which prohibits compliance." [84] There is no mention of NEPA by the FPC in the Panhandle case. And although the Commission's order denying rehearing in the Transco case does address the agency's responsibilities under NEPA, its reasoning is not cast in terms of a "statutory conflict" due to the need for prompt action but instead turns on the impossibility of preparing an impact statement on a curtailment plan under any circumstances.[85]

---

**78.** 494 F.2d at 936.

**79.** FPC v. Louisiana Power and Light Co., *supra* note 27, 406 U.S. at 642, 92 S.Ct. at 1839.

A holding in favor of petitioners on this point would also run afoul of court decisions to the effect that the Commission's jurisdictional limitations did not stand in the way of policy-making sensitive to factors not subject to FPC regulation. *See, e. g.,* Panhandle Eastern Pipe Line Co. v. FPC, 324 U.S. 635, 646–48, 65 S.Ct. 821, 89 L.Ed. 1241 (1945); Conway Corp. v. FPC, 167 U.S.App.D.C. 43, at 49, 51, 52, 510 F.2d 1264 at 1270, 1272, 1273 (April 4, 1975).

**80.** 42 U.S.C. § 4332(2)(C) (1970).

**81.** 494 F.2d at 948.

**82.** *Id.* at 937–38.

**83.** State of Louisiana v. FPC, *supra* note 43, 503 F.2d at 873.

**84.** 494 F.2d at 948.

**85.** Jt.App. 72 (Nos. 73–1999, 73–2017). The agency's reasoning in the Transco case echoed its statements in the El Paso Natural Gas Co. proceedings, Docket No. RP72–6, and the United Gas Pipe Line Co. proceedings, Docket Nos. RP71–29, RP71–120. It was viewed critically by the Fifth Circuit in State of Louisiana v. FPC, *supra* note 43, which concluded that an impact statement required nothing more than "a good faith attempt fully to evaluate a curtailment plan's environmental effects, reasonable alternatives, and other factors listed in NEPA . . .," and therefore that the many variables and uncertainties involved in evaluating the impacts of curtailment plans did not make compliance with NEPA impossible. *Id.* 503 F.2d at 876. We

We must be careful, however, that the requirement of findings not serve to convert remand to the agency into an "idle and useless formality." [86] Although these cases appear to us to be cut from the same mold as *American Smelting,* there might ordinarily be something to be gained from having the agency make that determination in the first place. But we are assured that final decisions in these proceedings are imminent. And in January 1975 the agency acknowledged that impact statements are required for permanent curtailment plans,[87] and directed its staff in the Transco case to prepare and circulate a draft. We may assume that staff in the Panhandle and Southern cases have been given similar instructions, or soon will be, as proceedings near an end. From a practical standpoint, we fail to see what petitioners might benefit from a remand at this juncture that will not be forthcoming under the FPC's present policy.

## VII.

We have examined the remaining contentions of the petitioners and have found them without merit.[88] By affirming the Commission in these cases, of course, we release our grip on the interim curtailment arrangements. We are confident that the Commission will proceed expeditiously to a final resolution and that whatever steps it decides to take pending that resolution will be consistent with the continuing oversight responsibility which we have outlined.[89] Prior to any reinstatement of the plans currently in abeyance on the Transco and Southern systems pursuant to orders of this court, we think the FPC would be obligated to consider, *inter alia,* the problems which have recently surfaced in judicial assessments of the 467 priorities as applied to particular pipelines, including Transco.[90] In order to insure a smooth transition, if one is necessary, we will continue the present stays in effect until such time as the Commission may move to dissolve them.

agree that a blanket exemption from NEPA cannot be drawn from the difficulty of environmental assessment in the context of curtailment.

**86.** NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766–67 n. 5, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). *See also* Massachusetts Trustees v. United States, 377 U.S. 235, 246–48, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964); Communist Party v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

**87.** Order of Jan. 10, 1975, *supra* note 22, at 14.

**88.** Among these are arguments that the Commission's acceptance of the 467 plans by the pipelines was invalid because it overrode contractual provisions and the terms of certificates issued by the Commission without prior hearing. We think these claims are foreclosed by the Supreme Court's decision in FPC v. Louisiana Power and Light Co., *supra* note 27,

and our subsequent decision in Michigan Power Co. v. FPC, 161 U.S.App.D.C. 221, 494 F.2d 1140, 1144 (1974), in which we stated that

permitting a pipeline's curtailment plan to take effect despite contrary terms in existing contracts is not inconsistent with the decision in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373, . . . (1956); and . . . a curtailment plan does not of itself constitute an abandonment of service within the meaning of section 7(b).

**89.** *See* text accompanying notes 63–64 *infra.*

**90.** *See* Consolidated Edison Co. v. FPC, *supra* note 17, 167 U.S.App.D.C. at ——–——, 511 F.2d at 379–381; State of Louisiana v. FPC, *supra* note 43, 503 F.2d at 871–872 (examining aspects of a Commission-imposed plan similar in many respects, but not identical to the 467 paradigm).