**HERCULES INCORPORATED,
Petitioner,**

v.

**FEDERAL POWER COMMISSION,
Respondent,**

**General Motors Corporation et
al., Intervenors.**

No. 76–1593.

United States Court of Appeals,
Third Circuit.

Argued Oct. 18, 1976.

Decided Jan. 5, 1977.

Morton L. Simons, Simons & Simons, Washington, D.C., for petitioner.

Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, Allan Abbot Tuttle, Sol., John H. Burnes, Jr., Atty., Allan M. Garten, Atty., Washington, D.C., for respondent, Federal Power Commission.

Edward J. Grenier, Jr., Richard P. Noland, Ronald L. Winkler, Sutherland, Asbill & Brennan, Washington, D.C., Frazer F. Hilder, Gen. Counsel, Julius Jay Hollis, General Motors Corp., Detroit, Mich., for General Motors Corp.

Richard M. Merriman, J. Richard Tiano, Richard T. Witt, Reid & Priest, Washington, D.C., for intervenor The General Service Customer Group.

Before ALDISERT and GIBBONS, Circuit Judges, MEANOR,[*] District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This petition for review of an order issued by the Federal Power Commission (FPC) brings to this Circuit its first exposure to the meandering efforts of that agency to deal equitably with the allocation of natural gas among customers of regulated natural gas pipelines in a period of chronic, nationwide natural gas shortages.[1] Although we have heretofore been spared the experience of such exposure, jurisdiction and venue are properly here because Delaware is the state of incorporation of Panhandle Eastern Pipeline Co. (Panhandle), which is the supplier of Hercules Incorporated (Hercules), the petitioner.[2] The order which we review, issued April 1, 1976, was entered in three separate, but interrelated, dockets: (1) Docket No. RP71–119, a curtailment proceeding in which the FPC sought to establish a permanent curtailment plan for Panhandle; (2) Docket No. RP74–31–22, a proceeding in which Hercules sought relief from Panhandle's curtailment plan that was in effect pending the completion of hearings as to its reasonableness; and (3) Docket No. RP76–75, a complaint proceeding by Hercules against Panhandle, challenging the latter's interpretation of its delivery obligations to Hercules. More specific references will be made hereafter to the nature of each of these proceedings.

The effect of the FPC's order of April 1, 1976, is to reduce substantially the amount of natural gas to which Hercules would be entitled by virtue of FPC Opinion No. 754, issued February 27, 1976. Opinion No. 754 found that Panhandle's previous curtailment plan was unreasonable because it turned availability of gas to a customer on whether the customer had contracted for a "firm" or "interruptible" supply.[3] Accordingly, it established a new curtailment plan for Panhandle whereby the rationing of gas was based exclusively on the end use by the ultimate consumer.

Under this new plan Hercules is entitled to receive greater volumes of gas than under the previous curtailment plan. However, the FPC order under review held that Hercules could not receive its full volumes of gas under the new plan until Hercules

---

[*] H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

1. See *Mobil Oil Corp. v. FPC*, 417 U.S. 283, 331, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974); *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 626 & n. 2, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972); *Pacific Gas & Electric Co. v. FPC*, 164 U.S.App. D.C. 371, 506 F.2d 33, 35 (1974). See generally FPC, Staff Report No. 2 on National Gas Supply and Demand 1971–1990 (1972); Breyer & Mac Avoy, The Natural Gas Shortage and the Regulation of Natural Gas Producers, 86 Harv. L.Rev. 941 (1973); Note, FPC Summary Action In Natural Gas Pipeline Interim Curtailment Practice, 17 B.C.Ind. & Com.L.Rev. 260 (1976); Comment, FPC Natural Gas Allocation: Curtailment in Context, 50 Texas L.Rev. 1370 (1972).

2. The Natural Gas Act, 52 Stat. 821, 15 U.S.C. § 717r(b) (1970), provides for review of Commission orders by "the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia."

3. See text at note 20 *infra*.

discharged certain natural gas "payback" obligations. These payback obligations had been imposed by the FPC as a condition precedent to Hercules' receipt of emergency volumes of gas, in excess of it entitlements under the previous curtailment plan. Hercules challenges the FPC order as arbitrary and capricious. It argues that since FPC Opinion No. 754 found Panhandle's previous curtailment plan to be unjust and unreasonable, the FPC cannot reduce Hercules' entitlements under the new plan in order to satisfy payback obligations incurred as a direct result of unlawful features of the previous curtailment plan. We agree.

## I. BACKGROUND OF THE LITIGATION

### A. *FPC's Statutory Authority*

Because of a nationwide shortage of natural gas a number of pipeline companies have been forced to ration gas among their customers.[4] Such rationing is carried out in accordance with natural gas curtailment plans that the pipelines file with the FPC as part of their tariff. In *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 642, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), the Court held that the FPC had the statutory authority to regulate such curtailment plans. This authority, the Court held, arises from the FPC's transportation jurisdiction[5] and § 16 of the Natural Gas Act,[6] which empowers the agency to take steps "necessary or appropriate to carry out the provisions" of the Act. In regard to the FPC's evaluation of curtailment plans the court said:

The substantive standard governing FPC evaluation of curtailment plans is found in § 4(b) of the Act:

"No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." 15 U.S.C. § 717c(b).

Two procedural mechanisms are available to enforce this antidiscriminatory provision of § 4(b). As to a tariff already on file and in effect, the FPC may proceed under § 5(a).[7] The § 5(a) procedure has substantial disadvantages, however, rendering it unsuitable for the evaluation of curtailment plans. The FPC must afford interested parties a full hearing on the reasonableness of the tariff before taking

4. See note 1 *supra.*

5. "Section 1(b) of the Natural Gas Act, 15 U.S.C. § 717(b) (1970) provides:
The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

6. 15 U.S.C. § 717*o.*

7. "Section 5(a) provides:
Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: Provided, However, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates." 15 U.S.C. § 717d(a).

any remedial action, and as we have observed "the delay incident to determination in § 5 proceedings through which initial certificated rates [as well as 'practices' and 'contracts'] are reviewable appears nigh interminable." . . . FPC has therefore chosen to process curtailment plans under § 4(c), (d), and (e).[8] Under these provisions, a pipeline's tariff amendments filed with the FPC go into effect in 30 days unless suspended by the Commission. If a filing is challenged or the FPC of its own motion deems it appropriate, it may suspend the amended tariff for up to five months, at the end of which time the amended tariff becomes effective pending the completion of hearings. In these hearings, the pipeline has the burden of proving that its plan is reasonable and fair.

406 U.S. at 642–45, 92 S.Ct. at 1839–41 (footnotes in quoted text renumbered and printed in margin).

While the § 4 procedure is superior to that of § 5 for the processing of curtailment plans because a plan may become effective upon filing as a tariff, it has the disadvantage that the FPC cannot order pipeline companies to file curtailment plans adhering to predetermined FPC policies on curtailment practices. Section 4 was designed for the implementation of industry initiated changes in rates, charges, classifications, or services.[9] In contrast, § 5 grants the FPC the power to order a pipeline company to adopt a FPC designed curtailment plan, but only at the conclusion of hearings in which the pipeline's existing plan is found to be unreasonable.[10]

## B. FPC's Response to the Natural Gas Shortage

The necessity for prompt implementation of a regulatory scheme for pipeline curtailment practices prompted the FPC to choose to process curtailment plans under § 4 rather than § 5.[11] Having no power under § 4 to impose its own curtailment plans upon the pipelines, it resorted to a jawboning strategy whereby pipelines were urged to

**8.** "These sections provide,

(c) Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, with such time (not less than sixty days from [the date this Act takes effect]) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect." 15 U.S.C. §§ 717c(c), (d), and (e).

**9.** See id.

**10.** Compare § 5(a), 15 U.S.C. § 717d(a), with § 4(e), 15 U.S.C. § 717c(e).

**11.** See 406 U.S. at 644, 92 S.Ct. 1827.

establish curtailment priorities in accordance with FPC policy guidelines.[12]

Pursuing this strategy the FPC issued an initial general policy statement, Order No. 431.[13] This order instructed pipeline companies expecting periods of gas shortages to file tariff schedules containing a curtailment plan. Order No. 431 implied that curtailment priorities should be based on the end use made of the gas and indicated that such plans, if approved, "will control in all respects notwithstanding inconsistent provisions in [prior] sales contracts. . ."[14]

The curtailment plans filed in response to Order No. 431 reflected conflicting views as to proper curtailment priorities. In an attempt to obtain greater uniformity the FPC issued more specific curtailment priority guidelines in Order No. 467.[15] That order stated that it was the FPC's policy to require curtailment on the basis of the ultimate consumer use of the gas (end use), and established nine priority of service categories based on such use. These priorities ranged from highest for residential, small commercial, and other "human need" uses through moderate for industrial processing use down to lowest priority for boiler use.[16] The order required full curtailment of lower priority customers before curtailment of higher priority customers.[17] Since Order 467 purported to be only a statement of policy and was adopted without notice and hearing, the FPC could not direct the pipelines to file conforming curtailment plans.[18] However, it warned that any nonconforming curtailment plans might be found to be unjust and unreasonable.[19]

## C. The Firm-Interruptible Distinction

Under Order No. 467's nine priority of service categories a distinction is drawn between customers who have contracted to receive gas on the basis of "firm" service as

12. See Consolidated Edison Co. v. FPC, 168 U.S.App.D.C. 92, 512 F.2d 1332, 1340–41 (1975).

13. 45 F.P.C. 570 (1971). See Pacific Gas & Electric Co. v. FPC, 164 U.S.App.D.C. 371, 506 F.2d 33, 35–36 (1974).

14. 45 F.P.C. at 572.

15. 49 F.P.C. 85 (1973). The FPC issued Order No. 467 on January 8, 1973, it was amended by Order No. 467–A (January 15, 1973), 49 F.P.C. 217, by Order No. 467–B (March 2, 1973), 49 F.P.C. 583, and by Order No. 467–C (April 4, 1974), 51 F.P.C. 1199 (1974). These orders will be referred to collectively as Order No. 467, unless otherwise necessary for clarity. The substantive provisions of Order No. 467 are codified in 18 C.F.R. § 2.78 (1975). See Pacific Gas & Electric Co. v. FPC, supra 506 F.2d at 36 and Consolidated Edison Co. v. FPC, supra, 512 F.2d at 1336–37.

16. The nine priority of service categories were as follows:
"(i) Residential, small commercial (less than 50 Mcf on a peak day).
(ii) Large commercial requirements (50 Mcf or more on a peak day), firm industrial requirements for plant protection, feedstock and process needs, and pipeline customer storage injection requirements.
(iii) All industrial requirements not specified in paragraph (a)(1)(ii), (iv), (v), (vi), (viii), or (ix) of this section.

(iv) Firm industrial requirements for boiler fuel use at less than 3,000 Mcf per day, but more than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.
(v) Firm industrial requirements for large volume (3,000 Mcf per day) boiler fuel use where alternate fuel capabilities can meet such requirements.
(vi) Interruptible requirements of more than 300 Mcf per day, but less than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.
(vii) Interruptible requirements of intermediate volumes (from 1,500 Mcf per day through 3,000 Mcf per day), where alternate fuel capabilities can meet such requirements.
(viii) Interruptible requirements of more than 3,000 Mcf per day, but less than 10,000 Mcf per day, where alternate fuel capabilities can meet such requirements.
(ix) Interruptible requirements of more than 10,000 Mcf per day, where alternate fuel capabilities can meet such requirements."
18 C.F.R. § 2.78(a)(1)(i)–(ix) (1975).

17. 18 C.F.R. § 2.78(a)(3) (1975).

18. See Pacific Gas & Electric Co., supra, 506 F.2d at 37–45, finding Order No. 467 to be only a general statement of policy rather than a binding rule.

19. See 49 F.P.C. at 585; Consolidated Edison, supra, 512 F.2d at 1340–41.

opposed to "interruptible" service.[20] Interruptible service, as opposed to firm service, may be terminated by the pipeline company on short notice during periods of peak demand.[21] *Arkansas Power & Light Co. v. FPC,* 170 U.S.App.D.C. 393, 517 F.2d 1223, 1229–31 (1975). On the basis of this distinction Order No. 467 placed gas used for essential industrial uses in Category 2 when the user had contracted to receive gas on a firm basis, and in Category 3 when the user has contracted to receive gas on an interruptible basis.[22]

Prior to the period of sustained gas shortage, interruptible service customers were infrequently subjected to a cut-off of their gas supply. When such a cut-off occurred it was usually of a brief duration during the winter when cold weather drove up the demand for gas.[23] In making a service priority distinction between firm and interruptible service, while at the same time expressing a policy that the national interest would be best serviced by assigning priorities on the basis of end use, the FPC assumed that interruptible service arrangements were for the most part predicated on end use considerations. As stated by the FPC:

> [W]e have determined that interruptible sales are for the most part, predicated on end-use considerations; those customers, be they direct sales or indirect sales, who require gas for human needs, service or non-substitutable industrial service do

not contract on an interruptible basis. Interruptible service, at the lower rates charged for such service, envisions interruption. And accordingly, interruptible customers can most reasonably be expected to have alternate fuel facilities already operational. We conclude, therefore, that curtailment should first fall on those who have not historically borne the full-fixed costs of providing gas service, particularly since these customers are best prepared to accept interruptions in service and clearly do not require uninterrupted service for protection of life or property.[24]

Since Order No. 467 was enacted without benefit of notice and hearing there was no immediate opportunity to test the accuracy of the assumptions underlying the firm-interruptible distinction. In *Pacific Gas and Electric Co., supra,* the D.C. Circuit held that Order No. 467 was only a general statement of policy and thus was exempt from the notice and hearing requirements of the Administrative Procedure Act,[25] and unreviewable under § 19(b) of the Natural Gas Act.[26] In so holding, however, the court emphasized that the validity of the curtailment policies enunciated in Order No. 467 would be tested since each 467-type curtailment plan which was filed under § 4 would be subject to administrative and judicial review if properly challenged.[27]

In *Consolidated Edison Co., supra,* the D.C. Circuit expanded on its holding in *Pacific Gas & Electric Co.,* by ruling that it

---

20. See note 16 *supra.*

21. The FPC defines "firm" and "interruptible" as follows:

"Firm service. Service from schedules or contracts under which seller is expressly obligated to deliver specific volumes within a given time period and which anticipates no interruptions, but which may permit unexpected interruption in case the supply to higher priority customers is threatened.

Interruptible service. Service from schedules or contracts under which seller is not expressly obligated to deliver specific volumes within a given time period, and which anticipates and permits interruption on short notice, or service under schedules or contracts which expressly or impliedly require installation of alternate fuel capability." 18 C.F.R. 2.78(c)(3), (4) (1976).

22. See note 16 *supra. Compare* 18 C.F.R. § 2.78(a)(1)(i), *with* § 2.78(a)(1)(ii).

23. *See Arkansas Power & Light, supra,* 517 F.2d at 1234.

24. *Id.* at 1233 (quoting 49 F.P.C. at 66).

25. 506 F.2d at 37–45.

26. *Id.* at 45–49. The court reasoned that since the order was only a general statement of policy it had no immediate significant impact upon the petitioning pipeline customers and thus the petitioners were not "aggrieved by an order" within the meaning of § 19(b) of the Act, 15 U.S.C. § 717r(b).

27. *Id.* at 43.

was not arbitrary for the FPC to allow 467-type plans filed under § 4 to become effective immediately pending the completion of hearings.[28] There, petitioners argued *inter alia* that the FPC was required to undertake a threshold investigation for weaknesses or inequities in plans filed in response to Order No. 467 before allowing such plans to become effective.[29] Rejecting this argument, the court noted that § 4 does not expressly require any preliminary review before allowing a tariff to take effect and refused to infer such a duty in light of the emergency conditions.[30] The court reemphasized that its ruling was not an approval of the substantive merits of any 467-type plan but only a decision to defer substantive review pending the completion of § 4 hearings.[31]

As a result of the above decisions the validity of the assumptions underlying the distinction between firm and interruptible service has so far escaped administrative and judicial review. However, it has recently begun to appear that the firm-interruptible distinction may be inconsistent with the policy of classifying service priorities on the basis of desirable end uses.[32]

### D. *Panhandle's Curtailment Practices*

Years prior to the sustained shortage of natural gas Panhandle had found it necessary to develop a system for rationing its gas during the coldest periods of the winter months. During such periods of peak demand Panhandle's tariffs called for cutting off service first to interruptible customers before halting service to firm customers. When the FPC issued Order No. 431 Panhandle responded by filing a revised tariff sheet containing a proposed curtailment plan. Under Panhandle's proposed plan, referred to as a "431 plan," the firm-interruptible distinction would have been eliminated and all customers placed in one of two categories. The lowest category and the first to be curtailed, would include all "industrial usage" customers regardless of end use. All other customers would be placed in the second, higher category.

Numerous customers protested this plan. Upon its filing, the FPC suspended it for a period of four months, and directed that hearings be commenced to determine its reasonableness.[33] These hearings were conducted under Docket No. RP71–119. Ordinarily, at the end of the four month suspension period, this plan would have become effective pending the completion of hearings. However, during the suspension period Panhandle and its customers negotiated an interim settlement plan. With the approval of the FPC this interim settlement plan was allowed to become effective through October 31, 1973.[34]

While the interim settlement plan was in effect the hearings on Panhandle's proposed 431 plan were continued in Docket No. RP71–119. These hearings concluded in August 1972. However, in January 1973, before the administrative law judge's final ruling on the 431 plan, the FPC issued Order No. 467. In response, Panhandle filed a curtailment plan patterned after Order No. 467. It also requested the FPC to extend the interim settlement plan beyond its October 31, 1973 expiration date. The FPC denied Panhandle's request for an extension of the negotiated plan, and ordered that Panhandle's 467 plan become effective as of November 1, 1973. Since Panhandle's 467 plan differed markedly from its pro-

---

**28.** 512 F.2d at 1339–45.

**29.** *Id.* at 1344.

**30.** *Id.; see Atlanta Gas & Light Co. v. FPC,* 476 F.2d 142, 148 (5th Cir. 1973).

**31.** 512 F.2d at 1344 & n.71, 1345.

**32.** *E. g., State of Louisiana v. FPC,* 503 F.2d 844, 872 (5th Cir. 1974); *Arkansas Power & Light Co., supra,* 517 F.2d at 1232–34.

**33.** Under § 4(e) the FPC has the power to suspend the operation of a proposed plan for up to five months before it becomes effective.

**34.** Under this negotiated settlement plan Panhandle's gas was apportioned two-thirds to its "resale" customers and one-third to its "direct" customers. (Direct customers purchase gas for their own consumption and resale customers purchase gas for distribution to ultimate consumers).

posed 431 plan, the hearings under Docket No. RP71–119 were reopened in order to incorporate into the record evidence on the propriety of the 467-type plan.

Panhandle's 467 plan embodied the service priorities in Order No. 467, including the priority distinction between firm and interruptible customers.[35] At the conclusion of the hearings in Docket No. RP71–119,[36] Administrative Law Judge Zimmet ruled, on August 29, 1975, that the priority distinction between Panhandle's firm and interruptible customers was unjust, unreasonable, and discriminatory, as it was inconsistent with the policy of basing curtailment priorities on end use. This finding was affirmed by the FPC in Opinion No. 754, issued February 27, 1976. In declaring the firm-interruptible distinction unreasonable, as applied to the Panhandle system, Opinion No. 754 states:

> Judge Zimmet finds first that interruptible service on the Panhandle system does not "connote inferior end-uses", since many direct industrial customers, which take Panhandle gas for feedstock, process and plant protection uses, operate under interruptible contracts as a condition of their FPC transportation certificates rather than by their own choice. Second, the assumption that interruptible customers have alternate fuel capabilities "fails to meet" the current issues, as historically the required alternate fuel capabilities were needed to meet short-term, cold-weather interruptions and not drastic, long-term curtailments. Finally, Judge Zimmet finds that this record does not support the general presumption that the firm customers alone have borne the costs of developing adequate facilities to serve all customers, since interruptible customers have paid the same rates

charged firm resale customers or higher rates.

\* \* \* \* \* \*

We affirm the Presiding Judge's conclusion that the firm-interruptible dichotomy should be eliminated, and particularly his primary finding that Panhandle's direct interruptible sales do not necessarily serve inferior end-uses. Our recognition of contractual distinctions in the assignment of service priorities was intended to supplement, but not surplant, [sic] basic end-use considerations. As we have previously observed:

> [t]he value of the firm-interruptible contract distinction as a curtailment standard is thus largely dependent upon the accuracy with which it reflects the intensity of a purchaser's need for gas.

Here the value of that distinction has been substantially impaired. The highest-priority industrial requirements of direct customers are now assigned to the third 467–B priority and consequently are now curtailed completely. Firm indirect customers receive limited service for comparable end uses throughout the year. This disparity does not result from the deliberate choice of a lower-cost class of service by the direct sale customers; it has occurred because our earlier transportation certificates mandated interruptible direct sales in order to protect Panhandle's residential heating load against short-term, weather related interruptions. The alleged difference in the ultimate industrial rates for direct versus indirect service is not a material consideration; it merely reflects the additional costs of a further distribution system. . . . In sum, we conclude that the most prudent course is to require curtailment according to end-use alone, since the firm-interrup-

---

**35.** See text at note 20 *supra*.

**36.** The hearings on Panhandle's 467 and 431 plans were closed in September 1974. These hearings were subsequently reopened in order to enter evidence on the environmental impact of these plans. *See* National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(c) (1970). By Order dated June 3, 1975, the FPC ordered that an initial decision on the reasonableness of these plans be issued no later than September 1, 1975, even if the environmental phase of the proceedings was not then complete. The environmental impact statement on Panhandle's system was not released until December 1975.

tible distinction is not a fully accurate indicator of relative need for gas and was intended only to serve as a refinement of the basic end-use approach.

These findings adopt the position which petitioner Hercules and Panhandle's other interruptible industrial customers have urged throughout the course of the hearings in Docket No. RP71–119. Based on these findings Opinion No. 754 established a new "interim" curtailment plan for the Panhandle system.[37] This new plan listed five service priority categories,[38] in contrast to the nine priority system of the 467 plan. Under this new plan interruptible customers, who were classified as Category 3 customers under the 467 plan,[39] were now placed in Category 2, on an equal basis with their counterparts who received gas under firm contracts.

### E. *Hercules' Emergency Relief Application*

Hercules operates an anhydrous ammonia plant in northeastern Missouri which uses natural gas supplied by Panhandle to produce ammonia which is further processed into agricultural fertilizers and explosives for the coal mining industry. Because Hercules had historically contracted with Panhandle to receive gas used for ammonia

production on an interruptible basis,[40] its needs were classified as Priority 3 under Panhandle's 467 plan.[41] In August 1974, while the 467 plan was in effect, Panhandle sent a letter to its customers advising them that it anticipated curtailing Category 3 volumes in excess of 50% during the period November 1974 through April 1975. Consequently, in September 1974, Hercules filed a petition, pursuant to 18 C.F.R. § 2.78(b) (1976), requesting temporary and permanent extraordinary relief from the curtailment priorities established by Panhandle's 467 plan.[42] The necessity for this request arose from the firm-interruptible priority distinction. Had Hercules been a firm customer it would have been placed in Category 2, and it would not need to have petitioned for such relief as its necessary requirements of gas for ammonia production would have been supplied.[43]

The proceedings in Hercules' petition for relief were assigned Docket No. RP74–31–22. It should be noted, however, that this proceeding is entirely ancillary to the basic § 4 proceeding testing the propriety of Panhandle's 431 and 467 plans.[44] There is no express statutory authority for such emergency relief applications. The necessity for such applications arises solely from the FPC's decision to: (1) issue Order No. 467 without conducting hearings on the reason-

---

**37.** A final plan could not be approved because the findings on the environmental impact of the plan were not ripe for review. See note 36 *supra*.

**38.** "Opinion No. 754 establishes these five service priorities:

(1) residential and small commercial (less than 50 Mcf per peak day) requirements; (2) large commercial (50 Mcf or more per peak day) requirements without alternate fuel capabilities, industrial requirements for feedstock, plant protection and process use, and pipeline customer storage injection requirements; (3) all industrial and commercial requirements not specified in (1), (2), (4) or (5); (4) industrial and commercial requirements of more than 300 Mcf per day, where alternate fuel capabilities can meet such requirements, other than requirements for boiler fuel use; (5) industrial and commercial requirements for boiler fuel use of more than 300 Mcf per day where alternate fuel capabilities can meet such requirements."

FPC Opinion No. 754–A at 2 n. 3 (Docket No. RP71–119).

**39.** See text at note 22 *supra*.

**40.** Many of Panhandle's large industrial users of gas, including Hercules, had never been given an opportunity to purchase gas on a firm basis because the FPC feared that they might take undue advantage of such an opportunity. *See, e. g.,* 7 FPC 48, 63 (  ).

**41.** See note 16 *supra.*

**42.** 18 C.F.R. § 2.78(b) (1976) details the procedures by which requests for relief from curtailment plans shall be processed. This provision is part of the codification of FPC Order No. 467–C. See note 15 *supra*.

**43.** See note 49 *infra.*

**44.** Docket No. RP71–119.

ableness of its underlying assumptions; (2) urge pipeline companies to file under § 4 curtailment plans modeled after Order No. 467, and (3) permit these plans to become effective prior to hearings on their reasonableness. Indeed, the FPC has recognized the ancillary nature of the extraordinary relief proceedings by captioning all pleadings and orders after the initial relief petition with both Docket Nos. RP71–119 and 74–31–22.

By order dated October 31, 1974, the FPC granted Hercules conditional temporary extraordinary relief. The order instructed Panhandle to deliver Hercules 7,530 Mcf per day of gas for feedstock and process purposes,[45] stating:

> It appears that the gas sought will be consumed in a high priority category, since the production from this plant aids in increasing both food and coal production which are important national goals. We therefore will grant the temporary relief requested for the period of November 1974 through April 1975, only, with a pay back requirement during the months of May 1975 through October 1975. In addition, if Panhandle is required to curtail its 467–B Category No. 2 customers during the latter November to April period, then the allocation of gas for Missouri

Edison will be subject to curtailment at the same percentage level as other Priority 2 customers.[46] (footnote omitted).

The order also fixed a date for the commencement of hearings on the merits of Hercules' request for permanent extraordinary relief.

On May 19, 1975, Panhandle informed Hercules that to effect the payback provisions of the October 31, 1974 order it intended to reduce deliveries by 176,650 Mcf per month during the summer of 1975. According to Hercules, such a reduction in its monthly allotments under Panhandle's 467 plan would force a shut down of its ammonia plant for 50% of the five month warm weather period. It therefore filed with the FPC a motion for an order expressly providing that such repayment not be required if the effect would be to shut down its ammonia plant.[47]

An administrative law judge held an evidentiary hearing on this motion. He concluded that it was in the public interest to provide Hercules with volumes of gas sufficient to support its production of ammonia used for agricultural fertilizer and explosives. His order granted Hercules a minimum of 5,000 Mcf per day pending the final disposition of Hercules' request for permanent extraordinary relief.

**45.** 18 C.F.R. § 2.78(c)(7) & (8) define gas used for feedstock and process purposes:

> "(7) Feedstock gas. Is defined as natural gas used as raw material for its chemical properties in creating an end product.
>
> (8) Process gas. Is defined as gas use for which alternate fuels are not technically feasible such as in applications requiring precise temperature controls and precise flame characteristics. For the purposes of this definition propane and other gaseous fuels shall not be considered alternate fuels."

**46.** The concept of requiring such payback obligations has been judicially approved. *See United States Steel Corp. v. FPC,* 175 U.S.App. D.C. 82, 533 F.2d 1217, 1223 (1976); *Texas Gulf Inc. v. FPC,* 494 F.2d 789, 792 (5th Cir. 1974). However, the term payback is somewhat misleading, for obviously no gas is ever paid back. Any gas delivered pursuant to an extraordinary relief order in a period of short supply is used by the customers. If there is to be any pay-

back it is by non-delivery in the future, hopefully when gas is not in such short supply, of volumes to which the customer would then be entitled. Hercules' contract with Panhandle called for the delivery of up to 15,000 Mcf per day. By permitting Panhandle's 467 plan to go into effect the FPC essentially abrogated this contract. Thus, any payback would. come by reducing Hercules' future allocations as permitted under the curtailment plan.

**47.** In its motion Hercules included a table setting forth its predicament as follows:

| | Hercules' Entitlement under [the 467] Plan | Payback per Panhandle Letter | Entitlement after Payback | Volumes Needed for Ammonia Feedstock & Proces: * |
|---|---|---|---|---|
| June | 309,221 | 176,650 | 132,571 | 218,800 |
| July | 287,157 | 176,650 | 110,507 | 218,800 |
| Aug. | 291,075 | 176,650 | 114,425 | 218,800 |
| Sept. | 297,059 | 176,650 | 120,409 | 218,800 |
| Oct | 70,185 | 176,650 | (106,465) | 218,800 |

* 7,530 Mcf per day, with monthly downtime estimated at approximately 6.25%.
App. 71.

Thereafter, on July 30, 1975, the same administrative law judge rendered his opinion on Hercules' application for permanent extraordinary relief from Panhandle's 467 plan. He concluded that the production of agricultural fertilizers, explosives for coal mining, and pesticides used approximately 54.4% of Hercules' total ammonia production; that these end uses had a high social utility as compared to other end uses; and that this production level could be maintained profitably and without shutdown if Panhandle supplied Hercules with a minimum of 4,600 Mcf of gas per day. He also held that these relief volumes should be placed in a special service priority category, ahead of Category 2 customers but below Category 1 customers.[48] Finally, he held that Hercules should "pay back" all relief volumes of gas:

> Hercules is required to pay back to Panhandle any volumes which Hercules has taken or may hereafter take (under Commission orders, Presiding Judge's orders, or otherwise) in excess of the amounts to which Hercules was, is, or will be entitled under Panhandle's effective curtailment plan. So long as that payback obligation exists, Panhandle shall deliver to . . . Hercules no more than 4,600 Mcf of gas per day; . . . *provided further,* that if and when Hercules has met its payback obligation and Hercules is entitled to more than 4,000 Mcf of gas per day under Panhandle's effective curtailment plan or otherwise, Panhandle shall deliver . . . to

Hercules, the amount of gas to which Hercules is so entitled.

The order further provided that it would remain in effect only as long as the gas is used in the production of agricultural fertilizer, explosives for coal mining, and pesticides, and that the relief would terminate no later than the issuance of the final order in the curtailment proceedings in Docket No. RP71–119.

## II. THE ORDER WE REVIEW

### A. Hercules' Complaint Proceedings

As we have pointed out, FPC Opinion No. 754 found the firm-interruptible priority distinction in Panhandle's 467 plan to be unreasonable, and established a new plan placing Hercules in Category 2. In Category 2 Hercules is far less likely to be subjected to curtailment than in Category 3, where during certain seasons curtailment would be virtually certain. Hercules is perfectly satisfied to be treated as a Category 2 customer, rather than in the special classification created by its grant of emergency relief. It points out that if it had been classified in Category 2 all along there would have been no need for it to apply for such extraordinary relief; and, that despite some Category 2 curtailment, it would have received more gas as a Category 2 customer than it actually received while classified in the special service priority between Categories 1 and 2.[49]

When the FPC issued Opinion No. 754 Hercules assumed that any payback obligations imposed as a result of Panhandle's 467

---

48. Hercules was placed in this special category to ensure that even if there was some curtailment of Category 2 users it would still be assured of getting its minimum production needs.

49. The volume of gas that Hercules received under grants of relief from Panhandle's 467 plan are shown below. The volumes that Hercules would have received under the 467 plan without relief, and under the Opinion No. 754 plan, had it been in effect, are also shown.

| | Old Plan | | Entitlement per Op. 754 |
|---|---|---|---|
| | w/o relief | w/relief | |
| | (Mcf) | (Mcf) | (Mcf) |
| Nov. '74 | 106,407 | 185,504 | 283,845 |
| Dec. | 15,035 | 202,382 | 255,594 |
| Jan. '75 | 9,145 | 80,521 | 118,805 |

| | Old Plan | | Entitlement per Op. 754 |
|---|---|---|---|
| | w/o relief | w/relief | |
| | (Mcf) | (Mcf) | (Mcf) |
| Feb. | 12,040 | 172,669 | 232,058 |
| Mar. | 15,190 | 217,312 | 239,352 |
| Apr. | 23,611 | 213,790 | 275,555 |
| May | 153,209 | 149,881 | 302,042 |
| June | 309,221 | 139,250 | 309,221 |
| July | 286,597 | 153,725 | 294,992 |
| Aug | 301,575 | 154,367 | 301,075 |
| Sep | 297,059 | 137,555 | 297,059 |
| Oct. | 70,185 | 128,798 | 281,320 |
| Nov | 12,300 | 135,961 | 199,991 |
| Dec. | 8,060 | 137,488 | 137,021 |
| Jan. '76 | 4,340 | 122,330 | 58,394 |
| Feb | 6,860 | 121,282 | 132,219 |
| Mar. | 10,230 | 135,000 | 161,194 |
| Totals | 1,641,064 | 2,587,815 | 3,879,737 |

Brief for Petitioner at 11; *see* App. 225.

plan were void. It reasoned that since the legal issue which relegated it to Category 3—the reasonableness of the firm-interruptible distinction—had been decided in its favor, payback obligations imposed because of this unlawful distinction would not be enforced.

Panhandle, however, by letter dated March 22, 1976, took the position that notwithstanding Opinion No. 754 it intended to continue to limit Hercules to 4,600 Mcf per day [50] until Hercules had "repaid" the 945,-000 Mcf it had received as special relief while the 467 plan was in effect. Panhandle argued that in the absence of an environmental impact statement Opinion No. 754 only established an interim curtailment plan for the Panhandle system and thus did not disturb any existing orders granting extraordinary relief. The effect of Panhandle's position was to deprive Hercules of the full benefits of its new Category 2 classification, leaving it as if it were still a Category 3 user placed in a special service priority category. Suddenly the shield of the emergency relief procedures, designed to minimize the harm in rapidly implementing curtailment plans without benefit of prior hearings, had become a sword to be used against a customer who had been erroneously classified.

Hercules protested, and on March 26, 1976, filed with the FPC a complaint alleging that Panhandle's proposed action was unreasonable and discriminatory.[51] The complaint pointed out that had Panhandle's 467 plan properly classified Hercules as a Category 2 user it never would have been necessary to seek emergency relief and thus incur payback obligations.[52] It urged that Panhandle misinterpreted both the continuing validity of the emergency relief order and Hercules' entitlements under Opinion No. 754. The complaint requested that all of Hercules' payback obligations be waived and that Panhandle be instructed to deliver

to Hercules its full entitlements of gas under Opinion 754.

On April 1, 1976, the FPC entered the order denying Hercules any relief and dismissing its complaint. The order recited that the firm-interruptible distinction was "valid and lawful" during the operation of Panhandle's 467 plan, that the concept of "payback" had been approved by the courts, and that Hercules is thus obligated to satisfy its payback obligations.

Our recent abolition of the firm-interruptible distinction will not justify a waiver of Hercules' payback obligation. That distinction was a valid and lawful feature of an interim plan prescribed necessarily before a record was available for review, and it was applied uniformly as one factor in determining the entitlement of every customer. Twice Hercules received additional gas, to which it was not entitled, under extraordinary exceptions. Hercules must now comply with the corresponding condition attached to its prior relief grants by foregoing any additional entitlements under Opinion No. 754 until its full payback obligation is discharged.

. . .. .

\*    \*    \*    \*    \*    \*

Pending further order of the Commission, or until the discharge in full of all payback obligations of Hercules, Panhandle shall deliver to Missouri Edison for redelivery to Hercules 4,600 Mcf/d, consistent with ordering paragraph (B) of the initial decision in Docket No. RP74–31–22, and shall apply any volumes exceeding 4,600 Mcf/d, to which Hercules may be entitled under Panhandle's then effective curtailment plan, toward discharge of Hercules' outstanding payback obligation.

Hercules timely filed an application with the FPC for "rehearing, and request for a stay" of the April 1, 1976 order. When no FPC action was forthcoming within 30

---

50. Under the plan established by Opinion No. 754 Hercules was entitled to 8,300 Mcf during the summer of 1976, the period during which Panhandle proposed to limit Hercules' deliveries. Brief for Petitioner at 13.

51. Hercules' complaint proceedings were assigned Docket No. RP76–75.

52. See table at note 49 *supra*.

days, it filed the instant petition for review.[53] This court by order dated July 19, 1976, granted Hercules' motion for stay of the April 1, 1976 FPC order and directed that the appeal be expedited.

B. *Proceedings Subsequent to the Petition for Review*

Technically, Hercules' petition for review of the FPC's order of April 1, 1976 is all that is before us. The FPC has nevertheless called to our attention additional subsequent actions by it in Docket No. RP71–119, Panhandle's § 4 curtailment proceedings, and in Docket No. RP74–31–22, Hercules' extraordinary relief proceedings. Both of these proceedings were still open when the petition for review was filed.

In Docket No. RP71–119 the FPC issued, on August 17, 1976, Opinion No. 754–A. This opinion was captioned "OPINION AND ORDER CLARIFYING AND DENYING APPLICATIONS FOR REHEARING OF OPINION NO. 754." In Opinion No. 754–A the FPC considered a number of applications for clarification of or rehearing on Opinion No. 754. Rejecting Hercules' request for relief for customers injured by the discriminatory and unreasonable aspects of Panhandle's 467 plan, the FPC said:

> A retroactive readjustment of past entitlements is neither required nor practical. We first reject Hercules' suggestion of past error. The 467–B plan was applied impartially to every customer. In approving its use, by order of November 6, 1973, the Commission was unable to consider or act upon specific evidence concerning the Panhandle system, for the present record was being developed in an additional round of hearings that had been convened on October 30, 1973. Instead, that plan followed precisely the Commission's general statements of policy on curtailment that could not address the particular situation of any one pipeline. Further, in Opinion No. 754, we

held specifically that the existing plan was currently unlawful and had to be modified prospectively. We did not state that the 467–B plan had been unjust and unreasonable from its inception or attempt the unprofitable task of fixing the certain past date whereupon the 467–B plan became unjust.[54]

In Docket No. RP74–31–22, the relief proceedings, the FPC issued an order on September 3, 1976, captioned "ORDER DISMISSING PETITION FOR EXTRAORDINARY RELIEF AND ORDERING PAYBACK." This order provided: (1) that Hercules' petition for permanent extraordinary relief is dismissed as moot since under the curtailment plan established by Opinion No. 754 Hercules is elevated to Category 2 status; (2) that all orders providing Hercules with temporary extraordinary relief are terminated, thus removing Hercules from the special service priority position between Categories 1 and 2; and (3) that Panhandle should withhold all volumes of gas above 4,600 Mcf a day until all volumes delivered to Hercules in excess of its entitlements under Panhandle's 467 plan have been "paid back." In response to Hercules' arguments in light of the findings in Opinion No. 754, this order states:

> The issuance of Opinion No. 754, does not compel a different result, as explained in our interlocutory order of April 1, 1976. The firm-interruptible distinction, although abolished in Opinion No. 754, was *a valid and lawful feature* of an interim curtailment plan necessarily established before a record was available for Commission review. It is part of the Commission's general statement of policy on curtailment in Order No. 467–B and was uniformly applied in determining each customer's entitlement. Similarly, when denying Hercules' corollary request for 'rectification of past error', Opinion No. 754–A, we rejected the contention that the 467–B plan was illegal during its

---

**53.** Section 19(a) of the Natural Gas Act, 15 U.S.C. § 717r(a) makes the filing of an application for rehearing before the FPC a precondition to judicial review, but provides that unless the application is acted upon in thirty days it will be deemed to have been denied.

**54.** Opinion No. 754–A at 15 (footnote omitted).

entire life span. We have made only the limited finding that the 467–B plan was currently unlawful and had to be modified prospectively. (emphasis added).

The FPC's present position, therefore, is not that Hercules' extraordinary relief order, including its payback provisions, is still in effect. Instead, it contends that Hercules' payback obligations must be satisfied because they were incurred during the operation of a "valid and lawful" curtailment plan—Panhandle's 467 plan—which was only prospectively unlawful as of the date Opinion No. 754 was issued.

## III. DISPOSITION

This petition for review raises the question whether Hercules is obligated to satisfy its payback obligations in light of the findings in Opinion No. 754. The starting point for an analysis of this question is the FPC's postulate that Panhandle's 467 plan was "valid and lawful" during its operation.

In *FPC v. Louisiana Power & Light Co., supra,* 406 U.S. at 642–45, 92 S.Ct. 1827, the Court noted with obvious approval the FPC's decision to process curtailment plans under § 4.[55] Cases subsequent to *Louisiana Power & Light Co.* have unanimously rejected challenges to the FPC's statutory power to allow curtailment plans filed under § 4 to become immediately effective pending hearings.[56] All of these cases, however, have emphasized that the immediate effectiveness of these plans does not determine their legality.[57] Rather, such immediate effectiveness only recognizes that the FPC "should be granted maximum latitude under section 4 'to act "now" and find facts later.'"[58]

The immediate effectiveness of a curtailment plan does not establish that it is "lawful and valid" under § 4(b).[59] The lawfulness of such a plan is the very question which a § 4 hearing addresses. Until a final determination is made that the plan is lawful under § 4(b), its legal status is an open question.[60] Indeed, it is arguable that such curtailment plans are presumptively illegal, since in proceedings pursuant to § 4 the pipeline filing the plan has the burden of proving lawfulness.[61]

Contrary to the FPC's position, Panhandle's 467 plan was never determined, either administratively or judicially, to be "valid and lawful" under § 4(b) during its period of operation. This plan was filed under § 4 and made effective pending the completion of hearings in Docket No. RP71–119.[62] Its legal status was at all times prior to the

55. See text at note 6 *supra.*

56. *Atlanta Gas Light Co. v. FPC,* 476 F.2d 142, 148–49 (5th Cir. 1973); *Consolidated Edison Co. v. FPC, supra,* 512 F.2d at 1342–45; cf. *Pacific Gas & Electric Co. v. FPC, supra,* 506 F.2d at 43.

57. *Id.*

58. *Consolidated Edison, supra,* 512 F.2d at 1344 (quoting *Atlanta Gas & Light Co., supra,* 476 F.2d at 148); *see* 406 U.S. at 642–45, 92 S.Ct. 1827.

59. *See Pacific Gas & Electric Co., supra,* 506 F.2d at 43–44. That such plans are only effective pending hearings, and not *per se* lawful, is clear from the language of § 4(e) pertaining to rate refunds. When an increased rate charge is filed pursuant to § 4 and made effective pending hearings, § 4(e) provides for the refunding of any monies collected while these rates are effective, and which are subsequently found to be not justified. *See, e. g., FPC v. Tennessee Gas,* 371 U.S. 145, 152–55, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962). Though we are here dealing with curtailment plans rather than rate increases, this language is dispositive of any contention that a curtailment plan becomes lawful merely because under § 4 it becomes effective pending hearings.

60. The FPC relies on the holding in *Consolidated Edison Co. v. FPC, supra,* 512 F.2d 1332, in support of its argument that Panhandle's 467 plan was lawful during the period of its operation. This reliance is misplaced. *Consolidated Edison* only holds that it was proper for Panhandle's 467 plan to become effective pending hearings. 512 F.2d at 1342–45. In so holding the court explicitly states that it is not passing on the substantive merits of Panhandle's 467 plan. *Id.* at 1344 & n. 71, 1345.

61. See § 4(e) at note 8 *supra: Pacific Gas & Electric Co., supra,* 506 F.2d at 43.

62. The FPC has implied that because Panhandle's 467 plan was made immediately effective without ever being suspended that we should view the portion of the proceedings in RP71–119 which pertained to the 467 plan as being

issuance of Opinion No. 754 an open question.

The legal status of Panhandle's 467 plan was first addressed in August 1975, when Administrative Law Judge Zimmet held it to be unlawful.[63] This finding of illegality was based upon the discriminatory distinction between firm and interruptible customers regardless of end use considerations. Judge Zimmet's finding was subsequently affirmed in FPC Opinion No. 754. In so affirming Opinion No. 754 reads in part:

> Presiding Judge Zimmet found the existing interim plan to be unjust, unreasonable, and discriminatory . . . [T]his finding is completely correct and must be affirmed."

\*   \*   \*   \*   \*   \*

> Judge Zimmet concludes that the [firm-interruptible distinction] was based on three general assumptions which do not 'hold up' on the Panhandle system and are not supported by this record. . . ."

After discussing each of these assumptions it is stated:

> The opposing equitable arguments have some merit, but they are not sufficient to compel a reversal of this central finding by the Presiding Judge.

Thus Opinion No. 754 is a holding that Panhandle's 467 plan was unlawful under § 4(b) during its entire period of operation because the firm-interruptible distinction was predicated on faulty assumptions. There is no indication in Opinion No. 754 of an intent to limit the holding of unreasonableness to a discrete moment in time. All of the evidence relied upon in support of the unlawfulness of the firm-interruptible distinction is applicable to the entire period of the plan's operation. We are not bound by such *post litem motam* documents as Opinion No. 754–A and the FPC order of September 3, 1976. *See, e. g., Burlington Truck Lines v. United States,* 371 U.S. 156, 167–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *S. E. C. v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Whether the FPC possesses the discretionary authority to render an opinion on the legal status of Panhandle's plan only as of some discrete moment, without ever passing on its legal status prior to that point, is a question not before us.[64] However, should the FPC desire in the future so to limit its findings it should do so with a reasonable degree of specificity, since the normal procedure in any § 4 hearing is to render a finding on the legality of the plan or rate in question during its entire period of operation.[65]

**63.** See text at note 36 *supra.*

**64.** In *Louisiana Power & Light v. FPC,* 526 F.2d 898, 908–910 (5th Cir. 1976) the court indicates that the FPC has the discretionary power to make such a limited finding. In so holding it distinguishes *Minneapolis Gas Co. v. FPC,* 111 U.S.App.D.C. 16, 294 F.2d 212 (1961) which holds that once the FPC has initiated § 4 proceedings and a decision on reasonableness has proceedings pursuant to § 5. This argument is clearly unfounded. First, there was no order instituted to convene § 5 proceedings; secondly, suspension is not statutorily mandated in order to convene § 4 proceedings; thirdly, in light of the Supreme Court's statement that a " § 5 procedure has substantial disadvantages . . . rendering it unsuitable for the evaluation of curtailment . . . plans," 406 U.S. at 643, 92 S.Ct. at 1840, we refuse to construe the proceedings in RP71–119 as being pursuant to § 5 in the absence of an order so stating. The FPC's decision not to suspend Panhandle's 467 plan simply has no relevance to this case.

been rendered by the administrative law judge the FPC must also rule on the reasonableness of the rate, or curtailment plan, in question. Though this question is not squarely before us, we do not find the Fifth Circuit's distinction of *Minneapolis Gas* persuasive. If 467-type plans do not ever have to be reviewed during their periods of operation then it seems in hindsight that Order No. 467 may actually be a substantive agency rule, and that the procedural safeguard of reviewing particular curtailment plans, instead of Order No. 467, may not provide any protection of practical significance. See *Pacific Gas & Electric Co., supra,* 506 F.2d at 43, 44; *Consolidated Edison Co., supra,* 512 F.2d at 1342–45.

**65.** In *Louisiana Power & Light Co. v. FPC, supra,* 526 F.2d at 908–09, the court notes prior attempts by the FPC to issue rulings of legality on particular curtailment plans during their entire period of operation. Such rulings have been issued in an attempt to provide the pipelines with a defense in suits for breach of con-

On the basis of the finding of unreasonableness in Opinion No. 754 we hold that all payback obligations incurred by Hercules as a result of the firm-interruptible distinction are now unenforceable. We do not question the FPC's power to impose such payback obligations as conditions precedent to receipt of emergency relief.[66] However, in imposing and enforcing such obligations the FPC must adhere to the substantive legal standards of § 4(b). In enforcing Hercules' payback obligations the FPC is now prospectively curtailing Hercules' entitlements to gas in a manner which gives continuing effect to the features of Panhandle's 467 plan which it has held to be illegal. Requiring payback obligations assumes that the party seeking relief is not entitled to the emergency volumes of gas. However, the system of entitlements can be no more valid than the curtailment plan. The power of the FPC to enforce payback obligations cannot extend beyond its power to impose the underlying curtailment plan which gives rise to the obligations. Enforcing such obligations after a finding that they were imposed as a result of an unlawful curtailment priority distinction is an abuse of discretion. To turn an emergency relief procedure intended to shield gas customers from interim injury into a sword, whereby the FPC can carry forward the unlawful effects of an unlawful curtailment plan, is to stand the relief procedure on its head.

In so holding we do not mean to indicate that Hercules is entitled to restitution for all injuries suffered as a result of Panhandle's unlawful curtailment plan. Unlike rate overcharges prior allocations of gas under a plan now found to have been unreasonable cannot be easily refunded. Not all parties injured as a result of the necessity to react quickly to the natural gas crisis

can be made whole. For here we are dealing with a constantly depleting natural resource which presents unique problems. As Justice Jackson noted:

> The heart of this problem is the elusive, exhaustible, and irreplaceable nature of natural gas itself. Given sufficient money, we can produce any desired amount of railroad, bus, or steamship transportation, or communications facilities, or capacity for generation of electric energy, or for the manufacture of gas of a kind. In the service of such utilities one customer has little concern with the amount taken by another, one's waste will not deprive another, a volume of service can be created equal to demand, and today's demands will not exhaust or lessen capacity to serve tomorrow. But the wealth of Midas and the wit of man cannot produce or reproduce a natural gas field.[67]

The order of April 1, 1976 will be set aside, and the case will be remanded to the FPC for the entry of an order that any payback obligations imposed on Hercules because of Panhandle's prior distinction between firm and interruptible customers are unenforceable so long as the FPC adheres to the position that the firm-interruptible distinction is unlawful. None of the parties before us challenge that position.

---

tract instituted by various pipeline customers. Apparently the FPC has now changed its prior policy and is not now attempting to insulate the pipeline companies from contractual liability by not rendering any determination on the legality of particular curtailment plans.

**66.** See note 46 *supra.*

**67.** *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 629, 64 S.Ct. 281, 300, 88 L.Ed. 333 (Jackson, J., dissenting).